## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | | |
|---|---|---|
| ANDREW HAYES, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | No. 2:18-cv-02070-TLP-tmp |
| v. | ) | |
| | ) | |
| KEVIN GENOVESE, Warden, | ) | |
| | ) | |
| Respondent. | ) | |

## ORDER TO UPDATE THE DOCKET WITH THE CURRENT RESPONDENT, GRANTING MOTION TO EXPAND THE RECORD, DISMISSING HABEAS PETITION, DENYING A CERTIFICATE OF APPEALABILITY, CERTIFYING APPEAL NOT TAKEN IN GOOD FAITH, AND DENYING LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL

Petitioner Andrew Hayes[1] petitioned pro se under 28 U.S.C. § 2254 ("§ 2254 Petition"). (ECF No. 1.)  Respondent answered the petition and filed the state court record.  (ECF Nos. 16 & 17.)   The issues in this habeas petition fall into two categories: (1) whether the procedural default doctrine bars his claims, and (2) whether the state court identified and applied the correct federal legal principles.  For the reasons discussed below, the Court finds that the procedural default doctrine bars one of Petitioner's claims and that the state court correctly applied federal law to the others.  As a result, the Court **DISMISSES** the § 2254 Petition.  The Court also **DENIES** a certificate of appealability, **CERTIFIES** that any appeal would not be taken in good faith, and **DENIES** Petitioner leave to proceed in forma pauperis on appeal.

---

[1] Petitioner is an inmate at the Northwest Correctional Complex ("NWCX") in Tiptonville, Tennessee.  His Tennessee Department of Correction ("TDOC") prisoner number is 477413. The current warden at NWCX is Kevin Genovese.  The Court respectfully DIRECTS the Clerk to update the docket with the current Respondent.

# BACKGROUND

I.    **State Court Procedural History**

In August 2010, a jury in Shelby County Criminal Court returned a verdict finding Petitioner guilty of first-degree murder during the perpetration of a felony and aggravated robbery.  (ECF No. 16-1 at PageID 147.)  The trial court sentenced Petitioner to life in prison for the murder conviction and twenty years in prison for the aggravated robbery conviction.[2]  (ECF No. 16-1 at PageID 168–69.)  He appealed and the Tennessee Court of Criminal Appeals ("TCCA") affirmed his convictions and sentence.  *State v. Hayes*, No. W2010-02641-CCA-R3-CD, 2012 WL 3192827 (Tenn. Crim. App. Aug. 6, 2012), *perm. app. denied* (Tenn. Nov. 28, 2012.)

He then petitioned pro se in Shelby County Criminal Court under the Tennessee Post-Conviction Procedure Act, Tenn. Code Ann. §§ 40-30-101 through 122.  (ECF No. 16-20 at PageID 2143–50.)  Appointed counsel later filed an amended petition.  (*Id.* at PageID 2175–86.)  The post-conviction court held an evidentiary hearing and denied relief.  (*Id.* at PageID 2188–98.)  Petitioner appealed and the TCCA affirmed.  (*Id.* at PageID 2199); *Hayes v. State*, No. W2016-00280-CCA-R3-PC, 2017 WL 2805205 (Tenn. Crim. App. June 28, 2017), *perm. app. denied* (Tenn. Nov. 20, 2017).

Typically the trial judge also hears post-conviction claims.  The trial judge here, however, moved to recuse herself and then granted that motion.  (ECF No. 16-20 at PageID 2170-74.)  So a different judge heard the post-conviction matters.  In the motion to recuse, the trial judge noted that it received a letter after the trial from the "Chief Investigator" alleging "the innocence of the

---

[2] The Court ordered Petitioner to serve his sentences concurrently.  (ECF No. 16-1 at PageID 168–69.)

Defendant and new evidence which may or may not involve alleged misconduct by the Defendant's original attorney and members of the Shelby County Sheriff Department." (*Id.*) And so the trial judge found that the letter created a "perception of possible bias (on the judge's part) would be prejudicial to the Defendant." (*Id.*) The motion referred to the letter and said it was attached as Exhibit A. (*Id.*) But the letter the trial judge referenced was missing from the record here.

When this Court asked whether the record here is complete, Respondent stated that he was unsure why the state criminal court clerk's office failed to include the exhibit in the record. (ECF No. 26.) Respondent noted that it was "the duty of the appellant to prepare a record which conveys a fair, accurate and complete account of what transpired with respect to the issues which form the basis of the appeal." (*Id.* at PageID 2416-17.)

The Court then appointed counsel for Petitioner to assist in determining what happened to the exhibit, what the exhibit said, and whether Petitioner's counsel had access to the exhibit during the post-conviction proceedings. (ECF No. 28.) During this process Respondent sent a formal document request to the Shelby County District Attorney General's office and the district attorney's officer "had and provided the letter to Respondent." (ECF No. 31.) Respondent has filed the letter provided by the district attorney's office as an exhibit here. (ECF No. 31-1.)

Petitioner's appointed counsel reviewed the original state court jacket and spoke with the Shelby County Criminal Court Clerk's office. (ECF No. 40.) Counsel discovered that the missing exhibit was in a sealed envelope in the jacket, the staff had overlooked it, and did not properly handle it when compiling the record here. (*Id.*) Petitioner's counsel noted that the exhibit had not been properly attached to the state court motion until she brought the envelope

and exhibit to the Criminal Court Clerk's attention and requested that the letter be attached. (*Id.*) The state court record thus was incomplete when Respondent filed the record.

Petitioner's counsel also spoke to Petitioner's post-conviction attorney, who advised he was only aware of the exhibit after speaking with defense investigator Clark Chapman before the post-conviction hearing. (*Id.*) Post-conviction counsel had not learned of the trial judge's recusal and had not received a copy of the letter. Petitioner's counsel has moved to expand the record here to include the exhibit for this Court's review. (ECF No. 41.) Respondent had no objection. (ECF No. 44.) So that motion is **GRANTED**.

Having had a chance to review the letter, this Court is now satisfied that Petitioner's post-conviction attorney was aware of the defense investigator's allegations at the time. In fact, that counsel called the investigator as a witness during the post-conviction hearing and explored the investigator's concerns in the letter. (ECF No. 31-1.) No evidentiary hearing will therefore be required for the Court's resolution of the issues raised by Petitioner in this federal habeas proceeding.

### A.    Evidence Presented at Trial

The TCCA opinion on direct appeal summarized the evidence presented at trial:

> The defendant's convictions in this case relate to the August 2007 beating death of the victim, Danny Harris, whose badly decayed corpse was discovered inside his Memphis apartment on October 26, 2007.
>
> At trial, Janice Jefferson, who testified that she was more commonly known as "Snow" and sometimes known as Janice May, said that in August 2007 she lived at 1651 Depass Street in Memphis along with the defendant, her daughter, Chawonna Jefferson, and her sons, John Jefferson and Tamarion Jefferson.[3] Snow testified that the defendant, who had "a nervous condition," was dating her daughter

---

[3] Because all of the other witnesses referred to Janice Jefferson as "Snow" during their testimony and because both Janice Jefferson and Chawonna Jefferson testified at trial, this Court will call the witness "Snow" to avoid confusion.

and that he helped pay the rent with his disability proceeds.  She said that he also did "a little work on the side" for a neighborhood grocer.

Snow testified that, toward the end of August 2007, Sarah Lucas and her boyfriend, a[] Hispanic man named "Miguel," moved into the Depass Street residence because Ms. Jefferson and the defendant were preparing to move out. Tammy Vance, Sarah Lucas' mother, also moved in for a brief time, telling Snow that she needed a place to stay while her boyfriend, the victim, "was in rehab." Snow recalled that Ms. Vance "had a black eye and like a deep scratch mark on her forehead" and that she claimed that the victim "had hit her in the eye because he was drinking and that's what made him go in rehab."  Snow said that the two women drove "a real nice truck" with four doors during the time that they lived in the Depass Street residence and that the women told her that the victim had given them permission to drive the vehicle during his stint in rehabilitation.

Ms. Jefferson and the defendant did not move as planned but continued to live in the house along with Ms. Vance, Ms. Lucas, and Miguel.  In October, Snow asked Ms. Lucas, Ms. Vance, and Miguel to move out of the house "because they couldn't pay on the utility bill."  Snow said that Ms. Vance was the first to leave the residence, but before she left, Ms. Vance offered to compensate Snow with "some groceries and . . . some Icehouse beer."  Later, Ms. Vance "brought in . . . a TV" that she claimed had been given to her by "a lady around the corner."  Finally, Ms. Vance brought in a handgun and offered it as payment to Snow; later, she asked Snow to help her sell the gun as well as the victim's truck, telling Snow that the victim "was going to be in rehab longer than she thought and he told her to go sell the gun to get her some food and stuff."  Snow acknowledged that she directed Ms. Vance to "Wheelchair John" to sell the gun.  Snow testified, at that point, that she became concerned about Ms. Vance's selling the victim's possessions, so she telephoned the police.

On Halloween, Snow met police officers at a nearby Mapco convenience store, where they had Ms. Vance "surrounded" in the victim's truck.  She led officers to the Depass Street residence and told them about the items Ms. Vance had given in exchange for rent.  Snow testified that she granted officers permission to search the residence.

Snow testified during cross-examination that she never saw the defendant in possession of any item belonging to the victim and that she had no personal knowledge of the defendant's being involved in the victim's murder.  She said that as far as she knew, the defendant had no relationship with either Ms. Vance or Ms. Lucas and had not met them prior to the women's moving into the Depass Street residence.

Snow testified that on Halloween, she was driven to the police station to give a statement, and the defendant followed in a borrowed car to give her "a ride back home."  She said that they left at approximately seven that evening and that

officers returned to her residence on November 2, "and that's when they kept" the defendant.  On November 2, she returned to the police station during the early morning hours at the request of homicide detectives, and when she arrived, the defendant "screamed out" to her, "I love you, momma, take care of my baby." Snow said that police told her that the defendant had implicated her in the victim's murder, and she asked the defendant why he had lied.

Sarah Lucas testified that in August 2007, she moved from her Cecilia Street residence to Snow's Depass Street residence because she did not like the living conditions at the Cecilia Street residence.  She said that she knew the defendant only as "Snow's son-in-law" and that the victim "was a man that [her] mother lived with."  She described the victim as "a very, very nice man."  Ms. Lucas testified that sometime in the beginning of August, her mother, Tammy Vance, came to her Cecilia Street residence bleeding from a cut on her head.  She said that Ms. Vance, who was driving the victim's truck, told her that the victim had struck her and that he had decided to enter "rehab because he was drinking too much and smoking too much cigarettes."  She said that she and her mother moved in with Snow "[a]bout two weeks" later.  Ms. Lucas recalled that Ms. Vance gave Ms. Lucas' boyfriend "a DVD/TV type deal" for his birthday and that she did not believe the item belonged to Ms. Vance.  She said that Ms. Vance also brought "a big huge TV" to Snow's residence in the back of the victim's truck.

Ms. Lucas testified that she first learned of the victim's death when police arrived to take her in for questioning.  She said police told her that the victim had been murdered inside his apartment.  She said that police took her in for questioning because she had pawned a "DVD/VCR" that belonged to the victim.  She testified that she pawned the item at her mother's behest and that Ms. Vance told her that the victim had given his permission for the item to be pawned.  She said she knew nothing about the victim's murder.

During cross-examination, Ms. Lucas testified that she came to testify at trial because Ms. Vance had implicated her in the victim's murder, saying that she wanted to "clear [her] name" and to "get justice for" the victim.  She said that Ms. Vance had implicated her in the victim's murder "[b]ecause she's crazy."  She acknowledged that Ms. Vance was in prison for the victim's murder.  Ms. Lucas said that she had no knowledge of the defendant's playing any role in the victim's murder.

Ms. Lucas conceded that the prosecutor had "cleared . . . up" the outstanding warrants for drug possession and prostitution that she had when she moved to Texas in 2008.  She admitted that she went to Arkansas to obtain an identification card but denied that she went with the victim and Ms. Vance to do so.  Ms. Lucas said that Ms. Vance asked to stay with her in August 2007 because "[s]he didn't want to stay by herself across town."  To her knowledge, Ms. Vance and the defendant did not have any type of personal relationship.

6

Leslie Kinnard, an employee at Woodchase Apartments in 2007, testified that in September of that year, she was directed to verify that the victim was still living in his apartment because the rent had not been paid.  Ms. Kinnard said that she knocked on the door, and when she got no answer, she "peep[ed]" inside the door and saw that the furniture was still in the apartment.  She said that after the victim failed to pay his rent by the 15th of October, the victim "was scheduled for a set out" at the end of the month.  Ms. Kinnard said that after following the appropriate legal procedure to evict the victim, she went to the victim's apartment with two sheriff's deputies and the property manager.  The deputies entered the apartment first, and they came out and told Ms. Kinnard that the victim was deceased inside the apartment.

Shelby County Sheriff's Department Deputy Stanley Gibson testified that he went to the victim's apartment to assist with an eviction on October 26, 2007.  When he entered the apartment, he noticed that the bedroom door was shut and that a towel or sheet had been placed at the bottom of the door.  He and his partner "popped the door open" and "observed a body lying in bed" and smelled a strong odor.  Deputy Gibson said that upon seeing the body, they left the apartment, secured the door behind them, and contacted their supervisors.

Memphis Police Department ("MPD") Officer Milton Gonzalez testified that on October 31, 2007, his office received a call that the victim's vehicle had been spotted in the "Jackson/Orchi" area of Memphis.  As he went to that location, he saw the vehicle being driven by a white female.  When the vehicle turned into the Mapco station, Officer Gonzalez initiated a traffic stop and removed the driver from the vehicle.  The driver identified herself as "Tammy" and told officers that she was the victim's girlfriend.  The vehicle was towed to the police station, and the driver was placed under arrest.

MPD Officer John Pasley testified that the victim's truck was seized and Ms. Vance arrested at the Mapco station.  He said that as the officers waited for homicide detectives to arrive, Snow and Ms. Jefferson approached him and said that "they knew something about the case" and that Ms. Vance "had left some items in their home that they thought [police] might be interested in."  He followed the women to their residence, where Snow showed him "a TV, a cell phone, and a little notebook journal" that she believed had belonged to the victim.  Officer Pasley said that he then telephoned homicide detectives, who told him to call the crime scene unit to photograph and collect the items.  Officer Pasley testified that he drove Snow and Ms. Jefferson to the police station and that the defendant followed driving a separate vehicle.  He then went to pick up Ms. Lucas, her boyfriend, and Wayne Bobo.  Unable to locate Mr. Bobo, he transported Ms. Lucas and her boyfriend to the police station.

On the following day, he and Sergeant Nelson met with John Watkins, who was also known as "Big John" and who was confined to a wheelchair, based on

information they had that the victim's handgun had been sold to Big John. They recovered the victim's weapon from Big John.

Bureau of Alcohol, Tobacco, and Firearms Agent Richard Howard testified that the Sig Sauer .40 caliber handgun recovered by Officer Pasley had been purchased by the victim on October 31, 2000.

MPD Crime Scene Investigator Jeffrey Alan Garey testified that when he arrived at the victim's apartment, "[t]he victim was laying on his back, on a bed, his left leg was hanging off the left side of the bed, foot touching the floor. The body was in a severe state of decomposition. There were flies throughout, maggots all over the body and the bedding." Investigator Garey testified that he collected a Sigarms "gunbox," a piece of mail postmarked August 14, 2007, a partial loaf of bread that bore an expiration date of August 17, bloody sheet rock and paint samples, three rings from the dresser, "an instruction manual for a Hitachi DVD player with video cassette recorder," and the sheets, pillows, and pillow cases from the bed where the victim's body was discovered. He photographed "an unidentified light spot with other lighter speckled spots on the carpet" in the bedroom, "possible blood spatter" on the south wall of the living room, "a corner of a wall area" that appeared to have "a blood print," a door jam[b] "where a possible bloody print was located," and "blood spatter on two separate walls in the bedroom."

MPD Lieutenant Bart Ragland testified that Lieutenant Mason, who was the lead investigator, asked him and Sergeant Parks "to go out and pick up" Ms. Vance, Snow, Ms. Jefferson, and the defendant. He said they were not suspects and that they drove to the police station in their own car. Lieutenant Ragland testified that he and Sergeant Parks interviewed the defendant, who they believed had relevant information "[b]ecause of his involvement with Tammy Vance and her daughter." During that first interview, the defendant's "story kept changing and changing and changing." Lieutenant Ragland said that at that point, "it became obvious . . . that he knew more than he was telling . . . and that he had more involvement than just being a witness," so they provided the defendant with *Miranda* warnings. The defendant had some difficulty reading the advice of rights form, so Lieutenant Ragland "read the entire thing to him and he understood it and we went over it." The defendant executed a written waiver of his rights at 3:15 p.m. on November 2, 2007, and he provided a statement at 5:57 p.m. that same day implicating Ms. Vance in the victim's murder, telling officers that he traveled with Ms. Vance and Ms. Lucas's boyfriend, Miguel, to an apartment in Cordova to get a 36 inch television. The defendant told officers that he opened a closed bedroom door inside the apartment because he "smelled the foul odor" and that he saw the victim's "body laying in the bed." He said Ms. Vance told him "not to worry" about the body because she and Miguel "were going to take care of it." The defendant described the body as "a white male, he was laying on his left side. He was about in his mid-fifties. He was medium build. His skin was turning black. His hair was brown, and he had a mustache, too." He said that he did not notice anything in the victim's mouth or any blood in the room. He said that he and Miguel loaded the

television into the victim's truck and that Ms. Vance also removed "a VCR and a DVD player that was built together and DVD movies." He said that they left the victim's apartment and traveled back to the Depass Street residence to pick up Ms. Lucas so that Ms. Lucas could pawn the items. The defendant told Lieutenant Ragland that he did not tell anyone about seeing the corpse in the apartment because he was afraid that he would be charged with the victim's murder because he had helped move the television.

Lieutenant Ragland said the fact that the defendant was able to describe the victim as a white male was suspicious because "the state of decomposition of the victim at the time" made it difficult "to tell that was indeed a male white." Lieutenant Ragland said that he spoke with the defendant on a second occasion and that the defendant "gave a statement, but he stopped. . . . And he refused to sign the statement." Between the giving of the two statements, Lieutenant Mullins "interviewed" the defendant, and "it became apparent that he had more involvement" than he had originally admitted. During the taking of the second statement, the defendant initially "admitted that he had actually been involved and hit the victim with a steel pipe" before he "recanted and said that, no, he didn't actually do it." Following this recantation, the defendant "became hysterical and started crying, and at that point, it became obvious [that officers] couldn't talk to him anymore." Shortly thereafter, the defendant was booked into the jail "on a forty-eight hour hold."

Lieutenant Ragland said that he became suspicious of the defendant when the details of the defendant's statement changed over tellings. Lieutenant Ragland admitted that he was not present when the defendant first admitted striking the victim with a pipe. He said that after recanting his admission of murder, the defendant blamed the victim's murder on Wayne Bobo, Snow, and Ms. Jefferson. He said that the defendant became "hysterical" and that it was impossible to continue the interrogation. Lieutenant Ragland denied that the defendant was upset at being accused of a crime he did not commit and said that the defendant was upset "[b]ecause he had admitted to his involvement and he knew he was up shit creek without a paddle, that's why." He said that the defendant immediately began recanting and blaming others "because that's what criminals do."

MPD Sergeant Anthony Mullins testified that he became involved in the investigation when he arrived at the scene. Later, Sergeant Mullins interviewed the defendant after the defendant was "developed as a possible suspect." He recalled that when he first came into contact with the defendant, the defendant was in Lieutenant Toney Armstrong's office. During that encounter, the defendant "could describe things in the apartment and describe things that happened and the more we asked him about what happened, he gave particular details that no one would know [] unless they committed the act." Sergeant Mullins said that upon further questioning, the defendant admitted killing the victim, telling officers,

They went there, him and Tammy Vance, to rob [the victim], and when they got inside an argument ensued.  He wanted to know, [the victim] wanted to know why they were there, how they got in his apartment, because Miss Vance had a key.  And during the argument, Tammy Vance threw a container of bleach at [the victim] and then he said he struck [the victim] in the head with an iron pipe, pushed him in the bedroom and struck him again, and again, and again.  Ultimately, he said, between seven and nine time[s].

Sergeant Mullins said that the defendant's statement "explained some of the things" that police had seen in the victim's apartment, like the rag in the victim's mouth, which the defendant said Ms. Vance had "stuck . . . in [the victim's] mouth to stop him from screaming."  Sergeant Mullins said that when they started to take a "formal" statement the second time, the defendant "was getting some [details] wrong" such as the location of the victim's apartment.  When Sergeant Mullins questioned the defendant about the mistakes, the defendant became "very upset" and said that "people have threatened him about this incident."  The defendant then blamed Wayne Bobo and an individual named Miguel for the victim's murder but continued to acknowledge that he was present during the murder.  During this time, the defendant was "[l]oudly crying and yelling."  When it became apparent that they would be unable to obtain a statement from the defendant, they took him "down to the jail on a hold" because they "felt like" they had sufficient proof "to charge him" but "weren't prepared to charge him at that point."

Sergeant Mullins testified that officers brought the defendant to the homicide office for another interview on the following morning.  The defendant was provided *Miranda* warnings a second time.  At that point, the defendant provided a statement admitting that he murdered the victim by striking him with a metal pipe "about seven or eight times on the head."  He said that he went to the victim's apartment "[t]o rob him.  Tammy said to ride with her to rob her boyfriend."  The defendant admitted, "I struck him the first time with the pipe.  She grabbed [the victim] by the mouth and shoved a face towel in his mouth."  The defendant said that he did not get blood on him and that Ms. Vance threw the murder weapon into the Wolf River.

Sergeant Mullins testified that he had been trained in "basic blood stain pattern analysis," which he described as "locating, analyzing, and documenting blood stain patterns on crime scenes and then interpreting that evidence to determine what can be determined."  He said that "victim location, assailant location" and "how the crime occurred" could be determined by analyzing blood stain patterns.  Sergeant Mullins testified that he had been at the crime scene on a single occasion "for a matter of hours" and that the defendant's statement "was corroborated by what [Sergeant Mullins had seen] at the crime scene previously."  He noted "cast-off" blood stains on the wall in the bedroom, which he described as "coming as a result of the blows" to the victim.  He said, "Once a blow is given and blood is transferred from him to the instrument, every swing is going to cast blood

off of that object, and in this case, a lot of it hits the surface of the wall." Sergeant Mullins also identified blood cast off on the floor and the closet door. Sergeant Mullins testified that based upon the "six distinct patterns" of blood stain, it appeared that the victim "had been hit at least six to eight times." He said that a "hard shove" would have sent the victim from the doorway of the bedroom onto the bed.

Doctor Marco Ross, the forensic pathologist who performed the victim's autopsy, testified that the cause of the victim's death was "[b]lunt force injuries of the head and asphyxia." Doctor Ross testified that the victim suffered "fractures of the skull in the right frontal area [and] the left frontal area" as well as "some fractures involving the bones around the orbit of the right eye, and the face, and a little bit on the right cheek, and the roof of the orbit on the right eye." In addition, the victim "had a fracture of the left upper canine tooth," which Doctor Ross found in "the airway of the right lung, probably in the region of the right main stem bronchus." Doctor Ross identified "some hemorrhage or material consistent with hemorrhage in the brain itself, although, due to the decomposed nature of the brain, it was difficult to precisely delineate where that hemorrhage may have originally come from." Doctor Ross noted that the victim was in "a moderately advanced stage of decomposition." Doctor Ross said that the victim "had an orange towel that was stuffed into his mouth" and that the towel pushed the victim's tongue back "and effectively block[ed]" the victim's airway. The location of the tooth in the bronchial tubes indicated that the tooth was knocked out before the rag was stuffed into the victim's mouth.

Doctor Ross testified that the victim suffered "a total of eight lacerations to the head area" and that "based upon the locations of the lacerations on the head and given the configurations of the head and face, . . . a minimum of five separate impacts to the head and face were sustained." He explained that his findings indicated that the victim suffered a minimum of five and a maximum of eight blows to the head. Toxicology testing detected "the presence of ethanol at a level of 199 milligrams per deciliter which on the breathalyzer scale is similar to a .19," but Doctor Ross cautioned that "alcohol typically forms as a result of the decomposition process."

Doctor Ross removed the victim's pacemaker device during the autopsy.

Joel Hunt, an employee in the "pacing division" of Boston Scientific, testified that he was charged with programming and trouble-shooting implantable pacemakers and defibrillators. Mr. Hunt identified the device removed from the victim as "a dual chamber, meaning it can pace and defibrillate the top chamber and the bottom chamber of the heart." By examining the data he removed via computer from the victim's pacemaker, Mr. Hunt learned that on August 20, 2007, the victim's heart rate accelerated to 205 beats per minute, activating the pacemaker, which regulated the heart rate. The victim's heart rate then accelerated to 289 beats per minute, which activated the defibrillator. The defibrillator

delivered two shocks "and then, from that point on nothing else is . . . detected or sensed." On October 27, 2007, the pacemaker delivered shocks, which could have been attributed to the autopsy. Although he could not say when the victim died, Mr. Hunt could say that all heart activity ceased on August 20, 2007.

Following Mr. Hunt's testimony, the State rested.

Doctor Randy Schnell, Clinical Services Coordinator of the Memphis City Schools Mental Health Center, identified a psycho-educational evaluation performed on the defendant to determine the defendant's eligibility for special education services. The defendant's intelligence quotient ("IQ") at the time of the test in 1992 was 62, which Doctor Schnell described as "well below average" and as indicating that the defendant's "mental development would be significantly delayed compared to other children his age." He said that the defendant's IQ score "was consistent with mental retardation." The defendant's scores on the Woodcock Johnson Psycho educational Battery and the Vineland Adaptive Behavior Scales confirmed a diagnosis of mental retardation. He said that it was "[e]xtremely unlikely" that the defendant's IQ score would have increased to normal levels by adulthood, noting that IQ scores "are reasonably stable by age fourteen," the age at which the defendant was tested.

Twenty-one-year-old Chawonna Jefferson, testified that she and the defendant dated for several years and had a three-year-old child together. She said that at the time of the victim's death, she and the defendant lived with her mother, Snow. Ms. Jefferson said that Ms. Vance and Ms. Lucas came to live in the home in late August 2007 and that at that time the women were driving a Silverado truck. She recalled that Ms. Vance had a bruise on her head and a black eye.

The 29–year–old defendant testified that he had never met the victim. The defendant said that he only went as far as the seventh grade and that he had taken only resource classes. He testified that his only source of income at the time of the victim's murder was a Social Security Disability check of $685 per month. He said that he worked at a neighborhood store sweeping the floor and stocking shelves in exchange for "Pampers and milk to provide" for the child he had with Ms. Jefferson. The defendant recalled that he first met Ms. Vance when she and Ms. Lucas moved into the residence owned by Snow. At that time, the women were traveling in the victim's truck. He said that Ms. Vance "had a gash in the center of her forehead and her eye was black."

The defendant testified that on November 2, 2007, officers returned to the Depass Street residence and asked him, Ms. Jefferson, and Snow to return to the police station for questioning. He said that they traveled to the police station together in the family vehicle. The defendant claimed that after he had waited alone in an interview room for several hours, Lieutenant Ragland told him that Ms. Vance had implicated him in the victim's murder. He said that he told them that he had no part in the victim's death. The defendant testified that although he initially

denied any knowledge of Ms. Vance's possession of the victim's handgun, he eventually told officers that he had gone with Ms. Vance and Snow to sell the gun to Wheelchair John. He said that the initial interrogation lasted "hours" and that he "got tired of sitting there." He claimed that the officers continued to scream at him for hours until he finally said, "What the f* * * do you want to hear, what do you want me to tell you [?]" He said that at that point, the officers created a statement that was allegedly given by him.

The defendant testified that although he had no knowledge whether Ms. Vance had killed the victim, he told the officers that she had "probably" killed the victim because she had accused him of doing so. He said that when he was in the office, the officers showed him a live feed of Ms. Vance's interrogation and told him that she was accusing him of the murder. The defendant admitted accusing a number of others, including Snow, of being involved in the murder "just so they would just leave [him] alone."

During cross-examination, the defendant said that he had never given a statement in a criminal case prior to this one and that he had never testified in court. The defendant admitted that he had tattoos of a pitchfork and "folk," which were associated with the Gangster Disciples. The defendant questioned the State's evidence, saying,

> The only evidence you all got against me is what Tammy said and that bogus statement that I gave. That's all you got. The detective just admitted it yesterday. If I wouldn't have said I had nothing to do with killing Mr. Danny Harris, I wouldn't be sitting here today. By me being stupid and constantly just allowing them to jus[t] drill me the way they did, if I would have just left it alone and let them deal with the[ir] job, I wouldn't be sitting here today. You know it and I know it.

The defendant insisted that he did not commit the crime, claiming that his statement contained only the repeated details about the crime that detectives had provided to him.

Tammy Vance testified that she pleaded guilty to first degree murder and aggravated robbery related to the victim's death. She nevertheless denied having killed the victim, whom she said she met through a chat line in January 2007. Ms. Vance testified that she lived with the victim for "about two and a half months" and that, during that time, the victim was not in good health because "all he did was drink beer and smoke cigarettes." She said that the victim gave her free access to his truck and personal finances, which came primarily from retirement benefits, so that she could manage his personal affairs. Ms. Vance claimed that the victim intended to file for bankruptcy because he could not make ends meet.

13

Ms. Vance testified that on August 20, 2007, she and the victim woke early to take Ms. Lucas to West Memphis to procure an identification card.  She said that Ms. Lucas was addicted to crack cocaine and that the victim "kind of felt for her because he had an addiction."  After concluding their business, the three went to Burger King, where the victim purchased food for Ms. Lucas.  Ms. Vance said that when she told the cashier to "go ahead and keep [the change] for somebody else," the victim became "very irate" and "started beating his fists on the dashboard, slapping his hat."  Despite the victim's outburst, they returned to the victim's apartment, and she prepared a fried egg sandwich for the victim's lunch.  She testified that as the victim ate, "he put the sandwich down and he got up and . . . he balled up his fist and he hit me in my head and split my head wide open, and I was dazed, I fell on my knees to the floor."  She said when she "came to" she found the victim and Ms. Lucas in the victim's bedroom.  Ms. Vance claimed that Ms. Lucas "had hit him with a hammer in the head, and he was laid back on the bed."  She said that she tried to stop Ms. Lucas, but Ms. Lucas struck the victim "a couple of times" and then struck Ms. Vance one time.  According to Ms. Vance, Ms. Lucas struck the victim "a total of seven or eight times.  Then when she got through with that, she took a rag and . . . put it down in his mouth."

Ms. Vance testified that Ms. Lucas' violent attack on the victim caused her to be "in total shock" and that she "did not know what to do."  She watched as Ms. Lucas poured kerosene and some "cleaning substances" over the victim's body.  Ms. Vance said that she complied with Ms. Lucas' command to pack her things and that the two women left the victim's apartment in the victim's truck.  Ms. Vance claimed that Ms. Lucas put the murder weapon in her bag and later disposed of it in a dumpster near a convalescent home.

The two women returned to the victim's apartment several days later to get a television and other items to pawn for money.  She first met the defendant on that day.  She said that she and Ms. Lucas had decided to blame the victim's murder on Wayne Bobo and that she initially did so when questioned by police.  She testified that after police told her that the defendant had confessed, she blamed the defendant for the murder in order to protect Ms. Lucas.  She said that "not a bit" of her statements incriminating the defendant was true.

Ms. Vance claimed that after she was charged with the victim's murder, she tried to tell her lawyer that Ms. Lucas had committed the murder.  Despite her innocence, she decided to plead guilty.  She said that just prior to entering her pleas, she wrote a statement exonerating the defendant and asked her attorney to give it to defense counsel.

During cross-examination, Ms. Vance acknowledged that she continued to cash the victim's checks.

Based on this evidence, the jury convicted the defendant as charged of felony murder and aggravated robbery.  The trial court imposed an automatic

sentence of life with the possibility of parole for the murder conviction and, following a sentencing hearing, a concurrent sentence of 20 years for the aggravated robbery conviction.

Following the denial of his timely but unsuccessful motion for [a] new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant contends that the trial court erred by denying his motion to suppress the incriminating statements he provided to police, that the trial court erred by admitting into evidence six photographs depicting the deceased victim, that the evidence adduced at trial was insufficient to support his convictions, and that the trial court committed plain error in its instructions to the jury. We consider each claim in turn.

*State v. Hayes*, 2012 WL 3192827, *1–10.

### B.   Evidence Presented at the Post-Conviction Hearing

The TCCA's post-conviction opinion summarized the evidence presented at the post-conviction hearing:

At the evidentiary hearing, Clark Chapman, the private investigator who was appointed to assist defense counsel, testified that he learned that the Petitioner had "numerous learning disabilities" and "nervous issues throughout his childhood and as an adult" and had been receiving disability benefits since the age of twelve or thirteen. Mr. Chapman identified the Petitioner's school mental health professional report, which he said he turned over to trial counsel approximately eight or nine months prior to trial. He testified he interviewed fifteen to twenty witnesses during the course of his investigation, including Frances Wheeler, the woman who owned the house where the Petitioner was living. He learned of her late in the case and interviewed her close to the time of trial. Ms. Wheeler informed him that she had gone to the Petitioner's home one morning because the Petitioner was supposed to help roof one of her rental properties. The Petitioner was still asleep when she arrived, and she instructed one of the other residents of the home to wake up the Petitioner. As she waited for the Petitioner, Tammy Vance and her daughter arrived in the victim's truck with a large screen television in the back of the truck. According to Ms. Wheeler, the Petitioner came out of the house and helped the women unload the television.

Mr. Chapman testified that he believed Ms. Wheeler's account coincided with the information he received from Ms. Tammy Vance, who confessed to him that it was her daughter, and not the Petitioner, who had killed the victim. He said he called trial counsel and informed him of what Ms. Wheeler had told him. He stated that trial counsel was not present during his interview with Ms. Wheeler and, to his knowledge, never interviewed Ms. Wheeler himself. He said that trial counsel was confident that the case "would either settle before [they] went into trial or . . . would just go away" and did not think they needed "anything else."

15

On cross-examination, Mr. Chapman testified that he spoke with the Petitioner throughout his preparation of the case and that the Petitioner appeared to be engaged in the investigative process and to understand everything he said to him. He said he thought that Ms. Wheeler would have been an instrumental witness in "identifying who had the TV that morning" and, as such, would have corroborated Ms. Vance's story that her daughter had killed the victim with a hammer. He acknowledged, however, that trial counsel had cross-examined Ms. Vance about her contention that her daughter was the perpetrator.

On redirect, Mr. Chapman explained that Ms. Wheeler's testimony that the two women brought the television to the house alone was significant because the State's theory was that Ms. Vance had to have the Petitioner's help in loading the television. In addition to Ms. Wheeler, he also thought that the defense should have had a physician appointed to investigate the Petitioner's mental health issues. He stated that the defense team contacted a doctor to perform a mental health evaluation on the Petitioner, but the physician backed out, citing a conflict of interest. To his knowledge, no one else was ever appointed to take that physician's place.

On re-cross-examination, Mr. Chapman acknowledged that the Petitioner provided details in his statement to police that were consistent with the physical evidence at the crime scene. He further acknowledged that the Petitioner said during cross-examination that the prosecutor would not be able to make him say anything he did not want to say. He explained, however, that the Petitioner had felt comfortable at trial because he was in the presence of trial counsel. In his opinion, a mental health expert would have been able to testify to the Petitioner's overall capacity and how he could be easily pressured in stressful situations, such as while being interviewed by aggressive police officers.

Upon further direct examination, Mr. Chapman testified that the Petitioner did not always appear to follow everything that was said to him and at times did not "seem like he [was] there." He further testified that the Petitioner's school report indicated that his intellectual functioning was in the "mild range of mental retardation." He said the Petitioner was questioned for twelve to thirteen hours before he gave his statement to the police.

The Petitioner's trial counsel, who said he had been licensed to practice law since 1973 and had been in private practice, primarily criminal defense, since 1984, testified that the Petitioner's case was the only one of hundreds he had handled in which he believed that an innocent man had been incarcerated. He stated he met with the Petitioner on "numerous occasions" during the course of his representation, and the Petitioner was very easy to talk to and appeared to understand the charges against him. The Petitioner could not, however, "process the technical side of it in terms of the law; in terms of evidence." According to trial counsel, the Petitioner's position was that he was not there and did not commit the

crimes, and the Petitioner could not understand why he had been charged in the case.

Trial counsel testified that they discussed having a mental evaluation performed on the Petitioner and "made an effort to contact someone for that purpose." However, the "intervening development" of Ms. Vance's changing her story about the Petitioner's participation in the crimes "changed the course of [their] strategy in th[e] case." He explained that there was no physical evidence linking the Petitioner to the crimes and that the Petitioner became a suspect only after Ms. Vance implicated him in her statement to the police. When Ms. Vance confessed that she had been trying to protect her daughter, and agreed to testify to that effect at trial, the issue of the Petitioner's mental capacity became less important:

> Her agreement to come and testify for the defense in this case kind of changed the course of the strategy that we were originally planning. And [the Petitioner's] mental state, mental condition ability were not seen as important in light of that new development with Ms. Vance agreeing to come and testify.

Trial counsel testified that his original plan was to hire a "confession expert," but he did not follow through with that plan in light of Ms. Vance's agreement to testify that her daughter was the perpetrator. In hindsight, however, he thought he made a mistake in not hiring the confession expert, who would have been able to explain to the jury why the Petitioner would have confessed when he was not guilty. He stated that he extensively prepared the Petitioner to testify, spending much time reviewing with him the length of the police interrogation and what led to his statement to the police, but that a confession expert could have helped the case tremendously and that he erred by relying too heavily on Ms. Vance's testimony. In addition, trial counsel believed he erred by not instructing the Petitioner to remain calm and to refrain from becoming aggressive or argumentative with the prosecutor. Trial counsel testified that, given the Petitioner's limited mental capacity, he should have anticipated that the Petitioner would become upset in the face of aggressive questioning and "would explode . . . under strenuous cross-examination."

Trial counsel testified that he did not have the bloody fingerprints found at the crime scene tested because there was no evidence that the Petitioner was at the crime scene and no evidence that the fingerprints belonged to him. As for his failure to exercise a peremptory challenge to strike Juror Number 7, who was an employee of the sheriff's department and a presumed co-worker of the victim's son, trial counsel testified that he could not recall his reasoning, but the juror's association with the sheriff's department would not have been an automatic basis for trial counsel to strike him. Counsel explained that he sometimes looked for jurors that he believed had "the ability to process evidence and facts and make an intelligent decision" and that he would not have automatically assumed bias on the part of a juror because he "was somehow affiliated with the sheriff['s] department."

On cross-examination, trial counsel testified that he never had any question about the Petitioner's competency to stand trial. He also acknowledged that he filed an unsuccessful motion to suppress the Petitioner's statement on the basis that the statement was coerced.

Frances Wheeler, the owner of the rental home in which the Petitioner had lived, testified that one morning she was at the property to work on the roof when Ms. Vance and her daughter pulled up in a white truck with a television in the back. The Petitioner, who was supposed to be helping her with the roofing, was asleep inside, but Ms. Vance's daughter went in and then stuck her head out to announce he would be out in a minute. On cross-examination, Ms. Wheeler testified that she was not sure of the date the events transpired.

The Petitioner testified that he was innocent and that he had had faith in trial counsel to prove his innocence. On cross-examination, the Petitioner acknowledged he had been a witness in another criminal case and that he understood his rights when the police interviewed him. He denied, however, that trial counsel prepared his trial testimony or kept him informed of the defense strategy in the case. On redirect examination, he testified that he was treated very differently by the police in the previous criminal case in which he had been merely a witness. He further testified that he only had an eighth grade education and that he spent his entire school career in resource classes.

On October 5, 2015, the post-conviction court entered a detailed written order denying the petition. On February 22, 2016, this court entered an order allowing the late-filing of the Petitioner's notice of appeal.

*Hayes v. State*, 2017 WL 2805205, at *3–6.

## II.    Petitioner's Habeas Claims

Petitioner now claims that trial counsel provided ineffective assistance in several ways. (ECF No. 1 at PageID 4.) First, he claims that counsel should have conducted a mental evaluation of Petitioner. (*Id.*) He argues next that his counsel was ineffective by not calling Ms. Wheeler as an eyewitness and for not striking someone from the jury. He also argues that counsel should have compared the fingerprints at the crime scene against the fingerprints of Sarah Lucas. (*Id.*) Finally, Petitioner claims that counsel should have objected to the trial court's jury instructions. (ECF No. 1-1 at PageID 15.)

Petitioner further argues that the trial court violated his due process right by denying his motion to suppress his statements to the police.  (*Id.* at PageID 13–14.)  The Court now turns to the legal standards for Petitioner's claims.

## LEGAL STANDARDS

Federal courts may grant habeas corpus relief for persons in state custody under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  But a federal court has limited authority and may grant that relief  "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Before a federal court may consider a state prisoner's request for habeas relief, it must examine the state court record for specific information.

## I.      Exhaustion and Procedural Default

A federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has exhausted available state remedies.  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).  The petitioner must present to the state courts the same claim for which it seeks redress in a federal habeas court under 28 U.S.C. § 2254(b) and (c).  *Id.* The petitioner must "fairly present"[4] each claim to all levels of state court review, including the state's highest court on discretionary review.  *Baldwin v. Reese*, 541 U.S. 27, 29 (2004).  That said, however, a petitioner need not present to all levels of state court if the state has explicitly disavowed state supreme court review as an available state remedy.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 847–48 (1999).

---

[4] To exhaust each claim, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam) (internal citation omitted).  Nor is it enough to make a general appeal to a broad constitutional guarantee.  *Gray v. Netherland*, 518 U.S. 152, 163 (1996).

Tennessee has done that.  Indeed, Tennessee Supreme Court Rule 39 eliminated the need to seek review in the Tennessee Supreme Court.  *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003).  Under Rule 39, "once the Court of Criminal Appeals has denied a claim of error, 'the litigant shall be deemed to have exhausted all available state remedies.'"  *Id.* (quoting Tenn. Sup. Ct. R. 39); *see Smith v. Morgan*, 371 F. App'x 575, 579 (6th Cir. 2010).

Much like the exhaustion requirement, the procedural default doctrine also applies to habeas petitions from state prisoners.   *See Edwards v. Carpenter*, 529 U.S. 446, 452–53 (2000) (noting the interplay between the exhaustion rule and the procedural default doctrine).  Under this doctrine, if the state court decides a claim on an independent and adequate state ground (such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim), the procedural default doctrine ordinarily bars a petitioner from seeking federal habeas review.  *Wainwright v. Sykes*, 433 U.S. 72, 81–82 (1977); *see Walker v. Martin*, 562 U.S. 307, 315 (2011) ("A federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment") (internal quotation marks and citation omitted)).[5]  In general, a federal court "may only treat a state court order as enforcing the procedural default rule when it unambiguously relied on that rule."  *Peoples v. Lafler*, 734 F.3d 503, 512 (6th Cir. 2013).

---

[5] The state-law ground may be a substantive rule dispositive of the case, or a procedural barrier to adjudication of the claim on the merits.  *Walker*, 562 U.S. at 315.  A state rule is an "adequate" procedural ground if it is "firmly established and regularly followed."  *Id.* at 316 (quoting *Beard v. Kindler*, 558 U.S. at 60–61 (2009)).  "A discretionary state procedural rule . . . can serve as an adequate ground to bar federal habeas review . . . even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others."  *Id.* (quoting *Kindler*, 558 U.S. at 54) (internal quotation marks and citations omitted).

If the procedural default doctrine bars a claim at the state level, the petitioner must show cause to excuse his failure to present the claim and actual prejudice stemming from the alleged constitutional violation. *Schlup v. Delo*, 513 U.S. 298, 320–21 (1995); *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Or he must show that a failure to review the claim will lead to a fundamental miscarriage of justice. *Id.Id*. For the latter, the petitioner must show that a constitutional error has probably led to the conviction of a person who is innocent of the crime. *Id.* at 321; *see also House v. Bell*, 547 U.S. 518, 536–39 (2006) (restating the ways to overcome procedural default and further explaining the actual innocence exception).

## II.    Merits Review Under § 2254

Under § 2254(d), where a state court decided a claim on the merits, a federal court should only grant a habeas petition if the state court's decision :

(1) was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2). Petitioner carries the burden of proof on this "difficult to meet" and "highly deferential [AEDPA] standard," which "demands that state-court decisions be given the benefit of the doubt." *Cullen*, 563 U.S. at 181 (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011) and *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)).

Under § 2254(d)(1), the court must limit its review to the record that the state court used to adjudicate the claim on the merits. *Id.* at 181–82. A state court's decision is "contrary" to federal law when it "arrives at a conclusion opposite to that reached" by the Supreme Court on a question of law or "decides a case differently than" the Supreme Court has "on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). A state

court makes an "unreasonable application" of federal law when it "identifies the correct

governing legal principle from" the Supreme Court's decisions "but unreasonably applies that

principle to the facts of the prisoner's case." *Id.*  So the state court's application of clearly

established federal law must be "objectively unreasonable" for the writ to issue. *Id.* at 409.  And

the habeas court may not issue the writ just because, "in its independent judgment," it determines

that the "state court decision applied clearly established federal law erroneously or incorrectly."

*Renico v. Lett*, 559 U.S. 766, 773 (2010) (citing *Williams*, 529 U.S. at 411) (internal quotation

marks omitted).

There is little case law addressing whether, under § 2254(d)(2), a state court based its

decision on "an unreasonable determination of the facts."  In *Wood v. Allen*, the Supreme Court

noted that a state-court factual determination is not "unreasonable" only because the federal

habeas court would have reached a different conclusion.[6]  558 U.S. 290, 301 (2010).  And in

*Rice v. Collins*, the Court explained that "[r]easonable minds reviewing the record might

disagree" about the factual finding in question, "but on habeas review that does not suffice to

supersede the trial court's . . . determination."  546 U.S. 333, 341–42 (2006).

The Sixth Circuit has described the § 2254(d)(2) standard as "demanding but not

insatiable" and has emphasized that, under § 2254(e)(1), the federal court presumes the state

court's factual determination is correct absent clear and convincing evidence to the contrary.

*Ayers v. Hudson*, 623 F.3d 301, 308 (6th Cir. 2010).  A federal court will not overturn a state

---

[6] In *Wood*, the Supreme Court granted certiorari to resolve whether, to satisfy § 2254(d)(2), "a petitioner must establish only that the state-court factual determination on which the decision was based was 'unreasonable,' or whether § 2254(e)(1) additionally requires a petitioner to rebut a presumption that the determination was correct with clear and convincing evidence." *Wood*, 558 U.S. at 299.  The Court found it unnecessary to reach that issue and left it open "for another day". *Id.* at 300–01, 304 (citing *Rice v. Collins*, 546 U.S. 333, 339 (2006) (recognizing that it is unsettled whether there are some factual disputes to which § 2254(e)(1) does not apply)).

court adjudication on factual grounds unless it is objectively unreasonable given the evidence presented during the state court proceeding. *Id.*; *see also Hudson v. Lafler*, 421 F. App'x 619, 624 (6th Cir. 2011).

## III.   Ineffective Assistance of Counsel

The standards from *Strickland v. Washington* control a claim that ineffective assistance of counsel deprived a defendant of his Sixth Amendment right to counsel.  466 U.S. 668, 687 (1984).  To succeed on this claim, a movant must show two elements: 1) that counsel's performance was deficient, and 2) "that the deficient performance prejudiced the defense."  *Id.* "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  *Id.* at 686.

To establish deficient performance, a person challenging a conviction "must show that counsel's representation fell below an objective standard of reasonableness."  *Id.* at 688.  A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range of reasonable professional assistance."  *Id.* at 689. The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id.* at 687.

To show prejudice, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[7]  *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.  And "[i]t is not enough for the defendant to show that the errors had some

---

[7] If a reviewing court finds a lack of prejudice, it need not determine whether, in fact, counsel performed deficiently.  *Strickland*, 466 U.S. at 697.

conceivable effect on the outcome of the proceeding." *Id.* at 693.  Instead, counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687; *see also Wong v. Belmontes*, 558 U.S. 15, 27 (2009) (per curiam) (stating "*Strickland* does not require the State to rule out" a more favorable outcome to prevail, but "places the burden on the defendant, not the State, to show a reasonable probability that the result would have been different.") (internal quotation marks omitted).

A federal court's deference to a state-court decision under 28 U.S.C. § 2254(d) increases when reviewing an ineffective assistance claim.  According to the Supreme Court in *Harrington*:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult.  The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.  The *Strickland* standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Harrington*, 562 U.S. at 105 (internal citations and quotation marks omitted).

What is more, the Constitution does not guarantee the right to an attorney in state post-conviction proceedings.  *Coleman*, 501 U.S. at 752.  "Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings." *Id.*  Attorney error cannot constitute "cause" for a procedural default "because the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must bear the risk of attorney error." *Id.* at 753 (internal quotation marks omitted).  When the State has no constitutional obligation to ensure that a prisoner has competent counsel, the petitioner bears the risk of attorney error. *Id.* at 754.

In *Martinez v. Ryan*, the Supreme Court recognized a narrow exception to the *Coleman* rule—"[w]here, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding." 566 U.S. 1, 17 (2012). In such cases, "a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance [of counsel] at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Id.* The Supreme Court also emphasized that "[t]he rule of *Coleman* governs in all but the limited circumstances recognized here. . . . It does not extend to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial, even though that initial-review collateral proceeding may be deficient for other reasons." *Id.* at 16. To excuse a procedural default under *Martinez* a petitioner must show:

> (1) the claim of "ineffective assistance of trial counsel" was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law *requires* that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding."

*Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (emphasis and alterations in original).

In *Martinez*, the Supreme Court considered an Arizona law that did not permit an inmate to assert ineffective assistance claims on direct appeal. *Martinez*, 566 U.S. at 4. In the Supreme Court's later decision in *Trevino*, the Court extended its holding in *Martinez* to states in which a "state procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal." 569 U.S. at 429. Thus, *Trevino* modified the fourth

*Martinez* requirement for overcoming a procedural default.  Both *Martinez* and *Trevino* apply to Tennessee prisoners.  *Sutton v. Carpenter*, 745 F.3d 787, 790 (6th Cir. 2014).

## ANALYSIS OF PETITIONER'S CLAIMS

Petitioner raises these issues in his § 2254 petition:

1.    Trial counsel performed deficiently by failing to:

    (a)    have a mental evaluation performed on Petitioner;

    (b)    call Ms. Wheeler as an eyewitness;

    (c)    strike a work colleague of the victim's son from the jury; and

    (d)    conduct an adequate investigation (specifically for not testing the bloody fingerprints at the crime scene) (ECF Nos. 1 at PageID 4; 1-1 at PageID 14);

2.    Trial counsel performed deficiently by failing to object to the trial court's incorrect jury instructions (ECF No. 1-1 at PageID 15–16); and

3.    The trial court violated Petitioner's due process rights by denying his motion to suppress his statements to police.  (*Id.* at PageID 13–14.)

The TCAA addressed Issue 3 on direct appeal.  *State v. Hayes*, 2012 WL 3192827, at *10–13.  And the TCCA addressed Issues 1(a)–(d) in the post-conviction appeal.  *Hayes v. State*, 2017 WL 2805205, at *6–7.  Because he raised Issues 3 and 1(a)–(d) in state court, he has exhausted these claims.  But Petitioner never presented Issue 2 to the TCCA.  So he did not exhaust this claim.

The Court will now turn to its analysis of these claims.

## I.    Issues 1(a)–(d)

Petitioner argues that trial counsel performed deficiently by failing to: (1) have a mental examination of Petitioner; (2) call Ms. Wheeler as an eyewitness; (3) strike a Sheriff's Department employee from the jury; and (4) analyze a bloody fingerprint from the crime scene.

(ECF Nos. 1 at PageID 4; 1-1 at PageID 14.)  Respondent counters that the state court reasonably applied *Strickland* when reviewing these claims and that its decision was not an unreasonable determination of the facts.  (ECF No. 17 at PageID 2391–95.)

### A.    The State Court's Review of These Issues

The post-conviction trial court analyzed each of these issues under *Strickland* and rule against petitioner.

> ### i.    Defense Counsel Failed to Have a Mental Health Evaluation Done on the Petitioner After Gaining Knowledge of the Petitioner's History of Mental Health Issues; Defense Counsel Failed to Have the Petitioner's Reading Level Tested After Learning of the Petitioner's Reading Deficiencies and the Alleged Reading and Signing of a Written Statement.

Defense counsel did meet the first prong of the *Strickland* test by acting reasonably.  The first prong of the *Strickland* test is that the defendant must show that counsel's actions were so deficient that counsel was not functioning as counsel that is guaranteed by the Sixth Amendment.  *Strickland*, 466 U.S. at 687.  In Tennessee, this means that the counsel's actions were so serious that they fall below an objective standard of reasonableness.  *Goad v. State*, 938 S.W.2d 363, 369.  Although he admitted to not scheduling a mental health exam or reading and writing assessment for Petitioner, Defense counsel's theory for the defense was his belief that Petitioner was not at the scene of the crime.  PC Tr. pg. 46.  Strong deference is to be given to counsel's strategy and defendants must overcome the presumption that the challenged action might be considered sound trial strategy.  Defense counsel's actions in the matter at hand were sound.  He said because there was no physical evidence to show that Petitioner was at the scene of the crime and Tammy Vance ("Ms. Vance") agreed to testify that Petitioner was not the one who committed the crime, that Petitioner's mental state and literacy were not seen as important.  Thus, he chose to change the course of his strategy.  Further, Defense counsel said that before and throughout the trial, Petitioner knew right from wrong and understood the charges against him.  Considering the totality of the circumstances and that there was more than one route that Defense Counsel could have chosen at trial, his actions were reasonable and those guaranteed by the Sixth Amendment.

Mr. Garrett's performance did not prejudice the outcome of the case.  This second prong requires an assessment of whether trial counsel's performance was so deficient that it prejudiced the outcome of the case.  Petitioner claims that if Defense counsel had a doctor to perform a mental health exam on Petitioner and had him to take a test to assess his literacy that the outcome of the trial would have

differed significantly. More specifically, that Petitioner's statement to officers would not have been voluntary. Defense counsel was aware of Petitioner's low IQ level and his inability to understand legal analysis. However, Petitioner understood the charges against him, signed a copy of the statement affirming that he voluntar[il]y made it, and knew wrong from right. Petitioner had also been a witness in prior criminal cases and understood witness rights when they were read to him at that time. Since Petitioner knew what was going on in the case, gave his signature affirming the truth of the statement and had been involved in criminal cases before, there was ample evidence to prove that Petitioner's statement was voluntary. The lack of a recent mental health exam did not prejudice Petitioner and change the outcome of the case.

(ECF No. 16-20 at PageID 2192–94.)

### ii.    Defense Counsel Was Not Ineffective for Failing to Interview and Investigate the Testimony of Francis Wheeler.

Defense Counsel's failure to interview Francis Wheeler ("Ms. Wheeler") would not have changed the outcome of the case. Petitioner must establish that Ms. Wheeler's testimony would change the verdict by a clear and convincing evidence. Though Ms. Wheeler would have testified that Petitioner was at her home during the time of the robbery, the robbery only occurred after the murder, thus [it is] a separate matter. Further, there were other statements and pieces of evidence that the jury could use to conclude a guilty verdict, such as Petitioner confessing to the murder. Since Petitioner fails to identify how Mrs. Wheeler's testimony would alter the verdict at trial, there is a substantial doubt about the correctness of the conclusions drawn from the evidence.

(*Id.* at PageID 2196–97.)

### iii.    Defense Counsel Was Not Ineffective When He Allowed an Employee of the Shelby County Sheriff's Department to Remain on the Jury When the Victim Was the Father of a Sheriff Deputy, As Well As the Courtroom Full of Sheriff Deputies During the Trial.

The decision not to challenge and have a member of the Shelby County Sheriff's department removed from the jury does not constitute ineffective assistance of counsel and the Petitioner has failed to adequately demonstrate that there was a "reasonable probability that the result would be different." *State v. Taylor*, 968 S.W.2d 900, 905. Defense counsel was aware of the position held by the juror as well as the fact that the victim's son was also a member of the Sheriff's department. PC. Tr. pg. 62. Defense counsel's decision not to challenge the juror was not based on a lack of preparation for voir dire, but instead a decision to favor who in his judgment was a fair and impartial juror, over a possibility of some possible bias based on his profession. PC. Tr. pg. 63. Moreover, that Petitioner has failed to show any reason for bias other than holding a job at the Shelby County

Sheriff's department. There has been no suggestion that the juror knew the victim or the victim's son.

Additionally, the case law presented in support of the Petitioner's request for relief is unpersuasive. It must first be noted that the cases cited by the Petitioner are not binding authority in this jurisdiction. Moreover, the cases are distinguishable in several respects from the present case. Most notably, in *State v. Lamere*, the defense counsel admitted that he had failed [to] realize the potential impartiality of the juror and that this was the result of his own oversight and lack of preparedness. *State v. Lamere*, 112 P.3d 1005, 1011. Secondly, the potential from [sic] bias stemmed from a very close relationship. The juror in question was the mother of a paralegal for the County Attorney's Office that was prosecuting the case. *Id.* Dissimilarly, the relationship in question here is between a juror and the son of the victim, whom the Petitioner doesn't contend know of each other. Additionally, the defense counsel here seems to have been aware of the juror's position at the Shelby County Sheriff's department.

The speculation that a juror is biased and unable to serve effectively is unsupported by the Petitioner's claims. As such he has failed to establish prejudice that was likely to affect the outcome of his trial.

(*Id.* at PageID 2195–96.)

### iv. Defense Counsel Was Not Ineffective for Failing to Have the Bloody Print on the Crime Scene Tested Against Sarah Lucas, After Gaining Knowledge That Said Daughter Might Have Been Involved in the Crime.

It is not the job of the Court to second-guess the trial strategy of the defense counsel. The theory of the case, according to the defense counsel, was that Petitioner was not/had not been at the victim's home. PC. Tr. pg. 46. The untested handprint did nothing to undermine that strategy. The Petitioner claims now that testing the print would have identified Sarah Lucas as the person responsible. However, Sarah Lucas had already admitted to being present at the scene of the crime. PC. Tr. pg. 79. Further linking her to the crime does nothing to undermine the other testimony and evidence at trial that lead to the Petitioner's conviction. Therefore, not testing the handprint was reasonable given the Defense's theory for the case and additionally any testing of the handprint is [sic] not necessarily undercut [by] any of the other evidence presented at trial.

(*Id.* at PageID 2195.)

The TCCA reviewed the post-conviction court's opinion. And it also considered Issues

1(a)–(d) under *Strickland*, the proper standard for analyzing an ineffective assistance of counsel

claim. *Hayes v. State*, 2017 WL 2805205, at \*6–7.  After reviewing the post-conviction

testimony and the postconviction court's decision, the TCCA opined:

> The record fully supports the findings and conclusions of the post-conviction court.  Trial counsel, a very experienced criminal defense attorney, offered a reasonable explanation for why he did not pursue a mental health evaluation of the Petitioner, explaining that there was nothing to link the Petitioner to the crime scene other than Ms. Vance's statement to the police.  Ms. Vance, however, later confessed to him that she had implicated the Petitioner to protect her daughter, who was the real culprit, and she agreed to testify for the Petitioner at trial.  Although trial counsel believed in hindsight that a confession expert would have helped explain why the Petitioner would confess to a crime he had not committed, he also testified that the Petitioner was mentally competent to stand trial and that he was able to elicit details for the jury about the lengthy interrogation and the Petitioner's emotional distress during questioning.  As the post-conviction court noted, the Petitioner also cannot show he was prejudiced by trial counsel's failure to have a mental evaluation performed.
>
> Trial counsel also offered a reasonable explanation for why he did not attempt to have the bloody fingerprint found at the crime scene tested against the fingerprints of Sarah Lucas and why he did not strike the sheriff's department employee from the jury.  As for trial counsel's failure to call Ms. Wheeler as a witness, we agree with the post-conviction court that her testimony would not have altered the outcome of the trial.  All that Ms. Wheeler would have added to the case was that she had seen Ms. Vance and her daughter arrive in a truck alone with a large television in the back.  She was unable to testify as to the date the events transpired or how the television got into the back of the truck.  In sum, the Petitioner has failed to meet his burden of demonstrating that he was denied the effective assistance of trial counsel.

*Id*. at \*7.

### B.    **Petitioner Fails to Show That Counsel Performed Deficiently**

In effect, Issues 1(a)–(d) are Petitioner's complaints about trial counsel's strategic

decisions before and during trial.  Petitioner argues that counsel should have performed a mental

evaluation and that he should have called Ms. Wheeler as a witness.  But when Petitioner's

codefendant decided to testify in Petitioner's defense, trial counsel's defensive strategy changed.

(ECF No. 16-22 at PageID 2263.)  Counsel decided not to bring some defenses or call certain

witnesses.  (*Id.* at PageID 2263–66.)  Trial counsel explained that Petitioner's "mental condition

[and] ability were not seen as important in light of that new development with Ms. Vance agreeing to come and testify." (*Id.* at PageID 2263.)

Counsel also decided not to call Ms. Wheeler as a witness. Her testimony at the post-conviction hearing shows that even if she had testified at trial, it would not have helped Petitioner's defense. She did not testify that Tammy and Sarah Lucas pulled up to the house with the television while Petitioner was asleep. (*See id.* at PageID 2287–88.) Instead, she testified that she "remember[s] Snow and Tammy Hess coming and pulling up in the truck with a TV in the back of it." (*Id.* at PageID 2287.) What is more, Wheeler's testimony did not identify *when* she saw the television in the truck. (*Id.* at PageID 2289.) All in all, this testimony did not help Petitioner's defense.

Trial counsel also made a considered decision not to strike the juror employed by the Sheriff's department. He did so because there "was no sufficient basis to excuse this particular juror because of some other factors . . . favorable to the defense." (*Id.* at PageID 2280.) And finally, trial counsel made a sound tactical decision against testing the bloody crime scene fingerprints. The reason is that no physical evidence placed Petitioner at the scene of the crime. (*Id.* at PageID 2275.)

In the end, Petitioner's claims lack facts or arguments showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Nor has he shown that counsel's decisions were objectively unreasonable. (*See* ECF No. 1-1 at PageID 14–15.) Plus, the district court presumes that a state court's factual findings are correct, absent clear and convincing evidence to the contrary. 28 U.S.C. §§ 2254(d)(2), 2254(e)(1). And Petitioner here fails to assert an argument or provide any evidence that overcomes this presumption.

31

Based on this Court's review of the post-conviction testimony (ECF No. 16-22), as well as the trial transcript (ECF Nos. 16-5, 16-6, 16-7, 16-8, 16-9, 16-10, 16-11, 16-12), Petitioner has not shown that the strategic decisions made by experienced, capable counsel were deficient.  And so, the Court finds it appropriate to defer to the state court decision on Petitioner's ineffective assistance claims.  The Court thus **DENIES** Issues 1(a)–1(d).

## II.    Issue 2

Petitioner claims that trial counsel provided ineffective assistance by not objecting to the trial court's incorrect jury instructions.[8]  (ECF No. 1-1 at PageID 15–16.)  Respondent, however, argues that the procedural default doctrine bars review of this claim.  (ECF No. 17 at PageID 2395–96.)

Petitioner did not raise this issue in either his pro se or amended post-conviction petitions.  (ECF No. 16-20 at PageID 2143–50; 2155–64; 2175–86.)  Nor did he raise the issue during the post-conviction appeal.  (ECF No. 16-23 at PageID 2326.)  His claim is therefore procedurally defaulted, unless he can show that the Court should excuse his procedural default under *Martinez*.  To do so, Petitioner must show, among other things, that his "claim of ineffective assistance of trial counsel was a substantial claim."  *Trevino*, 569 U.S. at 423 (internal quotations omitted).  And here, Respondent argues that the Court cannot excuse Petitioner's default under *Martinez*, because the claim is not substantial.  (ECF No. 17 at PageID 2390.)

When reviewing this claim on direct appeal, the TCCA considered Petitioner's argument and found:

---

[8] The trial judge told the jury that to convict Petitioner, it must find "that the defendant or one for whom the defendant is criminally responsible unlawfully killed the alleged victim, and that the killing was committed in the perpetration of or the attempt to perpetrate the alleged robbery." *State v. Hayes*, 2012 WL 3192827, at *16.  But the trial judge never defined "criminal responsibility for the conduct of another."  *Id.*

Conceding that he failed to lodge a contemporaneous objection to the jury instructions provided by the trial court and that he failed to include any issue related to the jury instructions in his motion for new trial, the defendant asks this court to review the jury charge for plain error in the trial court's instructions regarding the definition of criminal responsibility for the conduct of another.  The State contends that the defendant waived plenary review of the issue and that the defendant has failed to establish plain error in the instructions provided by the trial court.

Initially, as the defendant concedes, he has waived plenary consideration of any issue related to the jury instructions by failing to object to the omission at trial, *see* Tenn. R. Crim. P. 30(b); *State v. Lynn*, 924 S.W.2d 892, 899 (Tenn. 1996), and by failing to include it in his motion for new trial, *see* Tenn. R. App. P. 3(e) ("[I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in . . . jury instructions granted or refused . . or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived."); *see also State v. Martin*, 940 S.W.2d 567, 569 (Tenn. 1997) (holding that a defendant relinquishes the right to argue on appeal any issues that should have been presented in a motion for new trial but were not raised in the motion); *State v. Dodson*, 780 S.W.2d 778, 780 (Tenn. Crim. App. 1989).

Whether properly assigned or not, however, "an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial" where consideration of the error is "necessary to do substantial justice."  Tenn. R. App. P. 36(b).  Before an error may be so recognized, however, it "must be 'plain' and it must affect a 'substantial right' of the accused."  *State v. Adkisson*, 899 S.W.2d 626, 639 (Tenn. Crim. App. 1994).  Authority to correct an otherwise "forfeited error" lies strictly "within the sound discretion of the [appellate court], and the court should not exercise that discretion unless the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'"  *United States v. Olano*, 507 U.S. 725, 732, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993) (citations omitted).

In *State v. Smith*, 24 S.W.3d 274, 282–83 (Tenn. 2000), our supreme court adopted the definition of "substantial right" promulgated by this court in *Adkisson*.  There, we held that "[a] 'substantial right' is a right of 'fundamental proportions in the indictment process, a right to the proof of every element of the offense, and is constitutional in nature.'"  *Adkisson*, 899 S.W.2d at 639.  Our supreme court also adopted *Adkisson*'s five factor test for determining whether an error should be recognized as plain:

"(a)    the record must clearly establish what occurred in the trial court;

(b)    a clear and unequivocal rule of law must have been breached;

33

(c)     a substantial right of the accused must have been adversely affected;

(d)     the accused did not waive the issue for tactical reasons; and

(e)     consideration of the error is 'necessary to do substantial justice.'"

*Smith*, 24 S.W.3d at 282 (quoting *Adkisson*, 899 S.W.2d at 641–42). "[A]ll five factors must be established by the record before this court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id.* at 283. To be reviewable as "plain," the error "must [have been] of such a great magnitude that it probably changed the outcome of the trial.'" *Id.* (quoting *Adkisson*, 899 S.W.2d at 642) (alteration in original). Finally, "the burden of establishing entitlement to relief for plain error is on the defendant claiming it." *United States v. Dominguez Benitez*, 542 U.S. 74, 82, 124 S. Ct. 2333, 159 L. Ed.2d 157 (2004).

An accused's constitutional right to trial by jury, see U.S. Const. amend VI; Tenn. Const. art. 1, § 6, encompasses a right to a correct and complete charge of the law, *see State v. Teel*, 793 S.W.2d 236, 249 (Tenn. 1990). The trial court has a duty "to give a complete charge of the law applicable to the facts of a case." *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986); *see Teel*, 793 S.W.2d at 249; *see also* Tenn. R. Crim. P. 30.

The legal accuracy of the trial court's instructions is a question of law subject to de novo review. *See Troup v. Fischer Steel Corp.*, 236 S.W.3d 143, 149 (Tenn. 2007). The propriety of a given instruction is a mixed question of law and fact to be reviewed de novo with a presumption of correctness. *Carpenter v. State*, 126 S.W.3d 879, 892 (Tenn. 2004); *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001).

In its instruction on the offense of first degree murder in the perpetration of a felony, the trial court told the jury that, to convict the defendant, it must find "[t]hat the defendant or one for whom the defendant is criminally responsible unlawfully killed the alleged victim, and that the killing was committed in the perpetration of or the attempt to perpetrate the alleged robbery." The trial court did not define the concept of criminal responsibility for the conduct of another. Indeed, the trial court did not mention the concept again. During its deliberations, the jury sent the following question: "What is the meaning of criminally responsible as it applies to first degree murder associated with aggravated robbery[?]" The trial court responded, "The definition of criminal responsibility is in the jury charge, and you're going to have to find that definition. It's already there. Talks about what that means, and in fact, is there several times, all throughout the charge."

Despite the trial court's remarks, the printed instructions provided to the jury do not contain any definition or further reference to the concept of criminal responsibility. That being said, the record clearly establishes that the omission of the instruction, even if it was erroneous, was harmless beyond a reasonable doubt. The defendant was not charged under a theory of criminal responsibility for the conduct of another, and the only testimony that the victim was murdered by anyone other than the defendant came from Ms. Vance, whose testimony the jury rejected out of hand. The defendant invites us to speculate that the jury's question evinced its consideration that someone other than the defendant committed the murder, but we cannot and will not do so. Because any error in the omission of a criminal responsibility instruction was harmless beyond a reasonable doubt, the error did not adversely affect any substantial right of the defendant and consideration of the issue is not "'necessary to do substantial justice.'" *Smith*, 24 S.W.3d at 282 (quoting *Adkisson*, 899 S.W.2d at 641–42).

*State v. Hayes*, 2012 WL 3192827, at *15–16.

The TCCA's analysis on direct appeal explains that the trial court's error "was harmless beyond a reasonable doubt, [and] the error did not adversely affect any substantial right of the defendant." *Id.* at PageID *16. Indeed, trial counsel did not perform deficiently by failing to object to the trial court's harmless mistake. This is because the State did not charge Petitioner under a theory of criminal responsibility for the conduct of another. *See Hayes*, 2012 WL 3192827, at *16. All in all, Petitioner fails to present a substantial claim of ineffective assistance, and so, fails to overcome his procedural default. As a result, the Court **DENIES** Issue 2.

## III.    Issue 3

Petitioner alleges that the trial court violated his due process rights by denying his motion to suppress his statements to the police. (ECF No. 1-1 at PageID 12–14.) But Respondent argues that the TCCA applied the proper federal standard to this claim and that its decision was reasonable. (ECF No. 17 at PageID 2397–99.)

**A.      The TCCA's Opinion on Issue 3**

After reviewing the trial testimony, the TCCA opined:

> The defendant contends that the trial court erred by denying his motion to suppress the inculpatory statements he provided to police, claiming that the statements were obtained in violation of his constitutional rights.  The State asserts that the trial court did not err by denying the motion and admitting the statements as evidence at the defendant's trial.

> At the hearing on the defendant's motion to suppress his pretrial statements as involuntarily given, Lieutenant Ragland testified, as he later did at trial, that as he interviewed the defendant, "it became obvious that he knew more about the case than he was telling us and as we continued to interview him, we felt it was prudent to treat him as a possible suspect."  The defendant was then advised of his rights, and he signed a waiver of rights form.  Lieutenant Ragland testified that after the defendant had some difficulty reading the advice of rights form, he read the entire document aloud to the defendant.  He said that the defendant never asked for an attorney, never refused to answer any questions, and never gave any indication that he did not understand the process.

> Lieutenant Ragland testified that the defendant was provided several breaks to use the restroom and smoke cigarettes and that the defendant was offered food and water.  He denied telling the defendant what to say, noting that the officers "just wanted the truth."  Upon further questioning, the defendant admitted that he had gone to the victim's apartment to help Ms. Vance retrieve a television to pawn and that he had seen the victim's decaying corpse during that outing.  Lieutenant Ragland presented that statement to Sergeant Mason, who then asked Sergeant Mullins to interrogate the defendant.  Lieutenant Ragland testified that after Sergeant Mullins interrogated the defendant, he asked Lieutenant Ragland to take a "formal" statement from the defendant.  In that statement, the defendant admitted killing the victim.

> Lieutenant Ragland adamantly denied berating or threatening the defendant to get him to provide an inculpatory statement.

> During cross-examination, Lieutenant Ragland acknowledged that he had "basically" accused the defendant of lying, telling him that his statements were inconsistent.  Lieutenant Ragland said that the defendant did not tell him that he was a resource student.

> Sergeant Mullins testified that he interviewed the defendant in response to the defendant's interview with Lieutenant Ragland and "[b]ased on the information [officers] were getting" from Ms. Vance.  Sergeant Mullins said that when confronted with "all the information," the defendant "admitted that he was there and that he killed" the victim.  Although he had knowledge of the crime scene from

36

having visited it, Sergeant Mullins insisted that he did not relay any of that information to the defendant. He said that the details provided by the defendant during his confession matched the crime scene.

According to Sergeant Mullins, after the defendant gave the detailed confession, Sergeant Mullins sent Lieutenant Ragland to get a transcriptionist to take the "formal" statement. As they began taking the formal statement, however, the defendant "all of a sudden . . . gets it all wrong. He's not describing it the same way he described it before." When Sergeant Mullins told him to start over again, the defendant "started panicking, becoming upset, and claiming that others had committed the crime and threatened him and threatened his family if he told anybody." Sergeant Mullins said that the defendant "started saying that Janice Jefferson, who he called mom, had done it. He said a guy named Wayne Bobo had done it. He brought a couple of Hispanic names into it. Everybody but Andrew Hayes." At that point, they "stopped the statement."

Sergeant Mullins said that even during his breakdown, the defendant never asked for an attorney, never asked for questioning to cease, and never indicated that he did not understand the waiver of rights. Sergeant Mullins testified that the defendant provided another statement after he spent several hours in the jail on a 48–hour hold. That statement, he said, was consistent with the one given before the defendant's breakdown on the previous evening. Sergeant Mullins maintained that he did not threaten the defendant or tell him what to say.

During cross-examination, Sergeant Mullins testified that officers stopped questioning the defendant when it became clear that further interrogation "would have been counterproductive for everybody." He acknowledged that they did allow Snow to confront the defendant after he implicated her in the victim's murder. He testified that he thought that Ms. Vance might have been the first to implicate the defendant, and he acknowledged that he confronted the defendant with Ms. Vance's statement. He denied telling the defendant everything that Ms. Vance had said or that the defendant was interviewed in the room adjacent to Ms. Vance.

Ms. Vance testified at the hearing that she heard detectives yelling and screaming at the defendant and using "racial slurs."

The defendant testified that he only admitted killing the victim because the officers told him he would not be released until he told them what they wanted to hear. He acknowledged that officers offered him food and drink and permitted him breaks to smoke. He claimed, however, that they told him facts about the crime and showed him pictures of the crime scene before he confessed. He also claimed that officers did not provide *Miranda* warnings until he had already provided a confession.

During cross-examination, the defendant conceded that he traveled to the police station voluntarily in his own vehicle and that he had signed two advice of rights forms.

The trial court denied the defendant's motion to suppress, concluding that "the totality of the circumstances reflects an uncoerced choice to speak with law enforcement." The court accredited Lieutenant Ragland's testimony that he read the advice of rights form aloud to the defendant and observed that the defendant had signed two rights waivers and had initialed various parts of each incriminating statement.

On appeal, the defendant again complains that the statements were the product of law enforcement coercion. We consider the claim with a few well-settled principles in mind.

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, questions of credibility, the weight and value of the evidence, and the resolution of conflicting evidence are matters entrusted to the trial judge, and this court must uphold a trial court's findings of fact unless the evidence in the record preponderates against them. *Odom*, 928 S.W.2d at 23; *see also* Tenn. R. App. P. 13(d). The application of the law to the facts, however, is reviewed de novo on appeal. *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998).

The Fifth Amendment to the United States Constitution provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V; *see also Malloy v. Hogan*, 378 U.S. 1, 6, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964) (holding "the Fifth Amendment's exception from compulsory self-incrimination" applicable to the states through the Fourteenth Amendment). This means that, to pass federal constitutional muster and be admissible at trial, a confession must be free and voluntary and not "'extracted by any sort of threats or violence, nor obtained by any direct or implied promises, . . . nor by the exertion of any improper influence'" or police overreaching. *Bram v. United States*, 168 U.S. 532, 542–43, 18 S. Ct. 183, 42 L. Ed. 568 (1897) (citation omitted). The rule is equally applicable to confessions given during custodial interrogations following appropriate provision of *Miranda* warnings, *see State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980), and those provided before the defendant has been placed in custody, *see Arizona v. Fulminante*, 499 U.S. 279, 286–88, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991). To determine voluntariness, the reviewing court must examine the totality of the circumstances surrounding the confession to determine "whether the behavior of the State's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined—a question to be answered with complete disregard of whether or not [the defendant] in fact spoke the truth." *Rogers v. Richmond*, 365 U.S. 534, 544, 81 S. Ct. 735, 5 L. Ed. 2d 760 (1961).

Article I, section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. "The test of voluntariness for confessions under Article I, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996) (citing *State v. Stephenson*, 878 S.W.2d 530, 545 (Tenn. 1994)); *see also State v. Thacker*, 164 S.W.3d 208, 248 (Tenn. 2005). "The critical question is 'whether the behavior of the state's law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined.'" *Smith*, 933 S.W.2d at 455–6 (quoting *Kelly*, 603 S.W.2d at 728 (internal citation and quotation marks omitted)).[9]

Upon our review, we conclude that the record simply does not support the defendant's claim of coercion. The defendant, in his late twenties, was provided with *Miranda* warnings. Lieutenant Ragland read both the warnings and the advice of rights form aloud to the defendant on at least one occasion. Although the defendant's interrogation on November 2 was lengthy and no doubt intense, no evidence supports a claim that his will to resist was overborne. He was provided breaks to use the restroom and smoke, provided with a drink, and offered food. Although this court has roundly condemned the 48–hour hold procedure utilized by the Memphis Police Department, *see, e.g.*, *State v. Courtney Bishop*, No. W2010–01207–CCA–R3–CD, slip op. at 9 (Tenn. Crim. App., Jackson, Mar. 14, 2012), the record in the present case establishes that probable cause for the defendant's arrest existed at the time he was booked into the jail on the 48–hour hold. Under these circumstances, the trial court did not err by refusing to suppress his statements.

*State v. Hayes*, 2012 WL 3192827, at \*10–13.

**B.     The TCCA Correctly Applied Federal Law**

The TCCA correctly applied federal law on this issue. Under the Fifth Amendment to the

United States Constitution, "no person . . . shall be compelled in any criminal case to be a

witness against himself." U.S. Const. amend. V. The Supreme Court has held that "the

prosecution may not use statements, whether exculpatory or inculpatory, stemming from

custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards

---

[9] This test is exactly the same as that promulgated in *Rogers v. Richmond*, 365 U.S. 534, 544, 81 S. Ct. 735, 5 L. Ed. 2d 760 (1961); so it is not entirely clear that it effectuates the stated goal of providing more protection to the criminally accused.

effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  Under these safeguards, officers must tell a suspect that he has a right to remain silent and that he has the right to have an attorney present during questioning.  *Id.*

A defendant may waive these rights "provided the waiver is made voluntarily, knowingly and intelligently."  *Id.*  And "convictions following the admission into evidence of confessions which are involuntary, i.e., the product of coercion, either physical or psychological, cannot stand."  *Rogers v. Richmond*, 365 U.S. 534, 540 (1961).  To determine whether a confession is voluntary, the court asks "whether the behavior of the State's law enforcement officials was such as to overbear [the suspect's] will to resist and bring about confessions not freely self-determined. . . ."  *Id.* at 544.  As the Supreme Court in *Schneckloth v. Bustamonte* explained,

> In determining whether a defendant's will was overborne in a particular case, the Court has assessed the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.  Some of the factors taken into account have included the youth of the accused; his lack of education; or his low intelligence; the lack of any advice to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment such as the deprivation of food or sleep.  In all of these cases, the Court determined the factual circumstances surrounding the confession, assessed the psychological impact on the accused, and evaluated the legal significance of how the accused reacted.

412 U.S. 218, 226 (1973) (citations and footnote omitted).

It is the State's burden to show that a suspect has waived his rights by a preponderance of the evidence.  *Lego v. Twomey*, 404 U.S. 477, 489 (1972).  And "the admission of an 'involuntary' confession at trial is subject to harmless-error analysis."  *Arizona v. Fulminante*, 499 U.S. 279, 303 (1991).  Under that standard, if a trial error was harmless beyond a reasonable doubt, the court need not vacate the conviction.  *Id.* at 310.

Petitioner does not dispute that the officers gave him the appropriate *Miranda* warnings.  Instead, he argues that, after "hours" of questioning, "officers created a statement . . . allegedly

given by" Petitioner and "Petitioner was compelled to implicate himself." (ECF No. 1-1 at PageID 13–14.) But the § 2254 Petition does not address the standards for evaluating habeas claims on the merits. As a result, it is unclear whether Petitioner contends that the TCCA's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or whether it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) & (2). Even if Petitioner makes these arguments, his claim still fails.[10]

### i.   Petitioner Fails to Show that the TCCA's Decision Conflicted with Clearly Established Federal Law

First, Petitioner has not established that the TCCA's decision conflicted with any relevant Supreme Court decision. A state court's decision is "contrary" to federal law when it "arrives at a conclusion opposite to that reached" by the Supreme Court on a question of law or "decides a case differently than" the Supreme Court has "on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412–13. Here, the TCCA cited the correct legal rule from *Miranda* and from Tennessee decisions applying *Miranda*. *Hayes*, 2012 WL 3192827, at *12. So the TCCA properly relied on both federal and state case law here. And at any rate, the "contrary to" standard under § 2254(d)(1) does not require citation of Supreme Court cases "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam). That is the case here. The cases that the TCCA cited do not contradict the Supreme Court's decision in *Miranda*.

---

[10] Because his claim fails under either standard, the court need not determine whether Petitioner brings his claims under 28 U.S.C. § 2254(d)(1) or (2).

To be sure, the TCCA also cited federal and state decisions that do not accurately reflect the current state of federal constitutional law, as determined by the United States Supreme Court. For example, the TCCA quoted *Bram v. United States*, 168 U.S. 532, 542–43 (1897), for the proposition that officers cannot obtain a confession by "any direct or implied promises, however slight, nor by the exertion of any improper influence." *Hayes*, 2012 WL 3192827, at *12. But the Supreme Court has held that "under current precedent [that passage from *Bram*] does not state the standard for determining the voluntariness of a confession . . . ." *Fulminante*, 499 U.S. at 285.

Despite citing *Bram*, the TCCA still applied the correct test to find that Petitioner's confession was voluntary. *See Hayes*, 2012 WL 3192827, at *12–13. The Tennessee Supreme Court has stated that, although both the United States and Tennessee Constitutions protect against self-incrimination, "the test of voluntariness for confessions under Article I, § 9 [of the Tennessee Constitution] is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." *State v. Stephenson*, 878 S.W.2d 530, 544 (Tenn. 1994), *abrogated on other grounds by State v. Saylor*, 117 S.W.3d 239 (Tenn. 2003); *see also State v. Frasier*, 914 S.W.3d 467, 472 (Tenn. 1996) ("[T]his Court is not bound by the interpretations of the Fifth Amendment by the federal courts, except to the extent that they establish a 'floor' of constitutional protection."). The TCCA here analyzed Petitioner's confession under the Tennessee Constitution's more protective standard and found that his confession was voluntary. This conclusion is not "contrary to" any Supreme Court decision. As a result, Petitioner's argument that the TCAA's decision conflicted with Supreme Court precedent fails.

42

### ii.   Petitioner Fails to Show that the TCCA's Decision Unreasonably Applied Federal Law

Second, Petitioner has not satisfied his burden of showing that the TCCA's decision unreasonably applied any relevant Supreme Court decision.  An "unreasonable application" of federal law occurs when the state court "identifies the correct governing legal principle from" the Supreme Court's decisions "but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413.  To issue a writ of habeas corpus on these grounds, the district court must find that the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.  "Indeed, 'a federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'" *Renico*, 559 U.S. at 773 (citing *Williams*, 529 U.S. at 411).  Thus, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement." *Harrington*, 562 U.S. at 103.

Petitioner does not show that the TCCA decision unreasonably applied Supreme Court precedent.  Applying the appropriate "totality of the circumstances" test, the TCCA held that Petitioner's confession was voluntary.  *Hayes*, 2012 WL 3192827, at *12–13.  The TCCA noted that Petitioner "was provided with *Miranda* warnings." *Id.* at *13.  And that even though Petitioner's "interrogation on November 2 was lengthy and no doubt intense, no evidence support[ed] a claim that his will to resist was overborne." *Id.*  Although Petitioner disagrees with the TCCA's decision, he has not established that it "was so lacking in justification that there was

an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.  Petitioner's argument here fails.

### iii.    Petitioner Fails to Show that the TCCA Based Its Decision on an Unreasonable Factual Determination

Third, Petitioner has not shown that the TCCA based its decision on an unreasonable factual determination.  "[W]hen a federal habeas petitioner challenges the factual basis for a prior state-court decision rejecting a claim, . . . [t]he prisoner bears the burden of rebutting the state court's factual findings 'by clear and convincing evidence.'"  *Burt v. Titlow*, 571 U.S. 12, 18 (2013) (quoting 28 U.S.C. § 2254(e)(1)).  Plus "a state court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."  *Wood*, 558 U.S. at 301; *see also Rice v. Collins*, 546 U.S. at 341–42 ("Reasonable minds reviewing the record might disagree" about the factual finding in question, "but on habeas review that does not suffice to supersede the trial court's . . . determination.").

Here, Petitioner has raised no specific objections to the factual determinations relied on by the TCCA.  The TCCA found that the record supported the trial court's conclusion and that the trial court did not err by refusing to suppress Petitioner's statements.  *Hayes*, 2012 WL 3192827, at *13.  All in all, Petitioner has not shown by clear and convincing evidence that the state court made unreasonable factual findings. *See Burt*, 571 U.S. at 18.  Deference to the state court's decision here is appropriate.  And so, the Court **DENIES** Issue 3.

In sum, Petitioner's claims about Issues 1 and 3 lack merit.  And the procedural default doctrine bars Issue 2.  As a result, the Court **DISMISSES** the petition **WITH PREJUDICE**. The Court will enter judgment for Respondent.

## <u>APPELLATE ISSUES</u>

A petitioner has no absolute entitlement to appeal a district court's denial of a § 2254 petition. *Miller-El v. Cockrell*, 537 U.S. 322, 335 (2003). The Court has to issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a § 2254 petitioner. *See* Rule 11, Rules Governing Section 2254 Cases in the United States District Courts. A petitioner may not take an appeal unless a circuit or district judge issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A court may issue a COA only if the petitioner has made a substantial showing of the denial of a constitutional right, and the COA must reveal the specific issue or issues that satisfy the required showing. 28 U.S.C. §§ 2253(c)(2)–(3). A petitioner makes a "substantial showing" when he shows that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El*, 537 U.S. at 336 (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)); *Henley v. Bell*, 308 F. App'x 989, 990 (6th Cir. 2009) (per curiam) (holding a prisoner must show that reasonable jurists could disagree with the district court's resolution of his constitutional claims or that the issues presented warrant encouragement to proceed).

The petitioner also does not have to show that the appeal will succeed. *Miller-El*, 537 U.S. at 337; *Caldwell v. Lewis*, 414 F. App'x 809, 814–15 (6th Cir. 2011) (same). Even so, courts should not issue a COA as a matter of course. *Bradley v. Birkett*, 156 F. App'x 771, 773 (6th Cir. 2005) (quoting *Slack*, 537 U.S. at 337).

Here, there can be no question that Petitioner's claims lack merit. Because any appeal by Petitioner on the issues raised in this petition does not deserve attention, the Court **DENIES** a certificate of appealability.

And for the same reasons the Court denies a certificate of appealability, the Court finds that any appeal would not be taken in good faith.  The Court therefore **CERTIFIE**S under Fed. R. App. P. 24(a), that any appeal here would not be taken in good faith, and the Court **DENIES** leave to appeal in forma pauperis.[11]

**SO ORDERED**, this 24th day of March, 2022.

s/Thomas L. Parker
THOMAS L. PARKER
UNITED STATES DISTRICT JUDGE

---

[11] If Petitioner files a notice of appeal, he must pay the full $505 appellate filing fee or move to proceed in forma pauperis with a supporting affidavit in the Sixth Circuit Court of Appeals within 30 days of the entry of this order.  *See* Fed. R. App. P. 24(a)(5).